All right, our third case for this morning is Krik v. Exxon Mobil Corporation. Mr. McCoy. Thank you, Your Honor. I just want to begin by addressing the question of the juror surveillance the private investigators use. And I want to just start with this Sinclair case with the particular language here of the court about private investigators. Where the court says, and this is a unanimous decision, the most exemplary resent their footsteps dogged by private detectives. All know that men who accept such employment commonly lack fine scruples, often willfully misrepresent innocent conduct, and manufacture charges. The mere suspicion that he, his family, and friends are being subjected to the surveillance by such persons is enough to destroy the equilibrium of the average juror and render impossible the exercise of calm judgment upon patient consideration. Do you see any room for Did not request a hearing on the juror intimidation matter at the time it was discovered. I'm sorry, I missed part of the question. Why didn't you request a hearing on the juror intimidation matter at the very time it was discovered? The reason the hearing was not requested is because our position was that sufficient evidence had already been provided through the hearing that was conducted by the judge. When he called everybody in for the announcement of what had happened. That was the reason why no further hearing was requested. And I say that because the evidence that was elicited at that particular hearing with the judge established that there was the use of a private investigator. That it was not authorized. That it involved contact with a close friend of a juror who was a sitting juror. And that it was a juror that the defense had sought to exclude and that the contact did in fact occur. That was admitted. So that's all really that's required to establish what the Sinclair case says is an odious thing. But what bothers me about this is the factual differences between what went on in Sinclair on the one hand and what went on here. Sinclair, you've got 15 investigators actively surveilling the jurors until there's a mistrial. Here you've got one person not doing anything but asking this guy who had the birthday party a question. And the juror finds out about it, properly calls it to the court's attention. I think the juror was behaving in an entirely responsible way. But there's been a lot of attention to these jury issues since 1929 when Sinclair was decided. The concept that prejudice is a necessary part of this is something that you see in a lot of cases. So you need a rule that doesn't rely on prejudice at all, I think, to prevail. What, by the way, is the evidence that there was substantial prejudice arising from this contact with the juror's friend? So the prejudice that occurs is what I began reading from Sinclair, which is the fear that's instilled in people by the use of a private investigator. But your opponents point out, though, granted, no one, certainly not people serving on juries, welcomes the idea of a private investigator snooping around in their life. On the other hand, as the somewhat analogous, you can decide how analogous, comments about Internet surveillance, people get Googled, their Facebook accounts are looked at, Twitter, Instagram, you name it, Snapchat. It's all out there, and people do get investigated that way. Right, and that's their Internet. Do you think that's all okay, their Internet stuff? The Internet presence is not what this case is about. I understand that, but isn't it even more intrusive than what happened here? So if that's okay, then why do we need a rule that's this absolute no prejudice needs to be shown rule you're arguing for? Because the difference is the use of the private investigator on someone who's already been established to be a proper and fit juror and what that consequence of using that private investigator can be. Sinclair is the only case that addresses that point. There is no other case, and this Court is bound to follow Sinclair. But this isn't, Counsel, this is not a case about jury surveillance. She wasn't being surveilled. As I understand it, the private investigator was directed to interview the friend with the birthday party to find out who was at the party. It's not a case about jury surveillance. Well, first off, Sinclair specifically says friends. That's right in the language of the case, friends being subjected to surveillance. There is no surveillance. There's a contact. There's actual contact, which didn't even occur in Sinclair. Sinclair said you don't need actual contact, that that's not required, that that's not the test. The issue is the reasonable tendency. I'm quoting the case from page 74. Here's what they said. Under the doctrine so stated, we think the trial judge rightly held it unnecessary to allege or show actual contact between an operative of the detective agency and a juror or that any juror had knowledge of being observed. Right, no juror was contacted here. What we're talking about is a contact with a friend who may have been the honoree at a birthday party that both the juror and the plaintiff attended. So there's no contact with the juror herself, and there's no surveillance of any kind. Right, but the court goes on to say the mere suspicion that he, his family, and friends are being subjected to surveillance. But this gave rise to no suspicion of that sort. Well, she knew about it. She knew that the contact was made. She had no knowledge of surveillance, and if you suspected that, if you were concerned about that, you could have asked for a hearing. So the distinction being between an open contact, hi, I'm here, I wanted to ask you a question, and then on the one side somebody surveilling, which implies some kind of undercover actions, videoing or watching you. I wonder if, I mean, I would invite you, because time is short, to obviously brief this, and you can wrap this point up, because I want to ask you why what District Judge Shah did, vis-à-vis the cumulative exposure, wasn't entirely consistent with Judge Lee's ruling since, you know, we've been playing some word games among all of the parties on this, but it looks as though the evidence that you were offering was cumulative means even a little tiny, tiny bit more. It doesn't mean. I couldn't find any evidence in the record that there were estimated numbers of what this person's, you know, exposure years were, equivalent or anything like that. So we were just left with, well, if there's any exposure at all, it's a little more than that's enough to contribute to the disease. So anyway, I don't want to waste my time. If I may just wrap up Sinclair for a moment. Sure. Okay. And so the problem that the court focused on in Sinclair was that the private investigator can give false affidavits, and people know that, and that intimidates people, and that's what happened in Sinclair. That was the problem, that it was the affidavit. Had Mr. Crick lost this case, or had he won this case, then the defense could come in with an affidavit from that private investigator. Then you have a hearing about that private investigator's affidavit. In Sinclair, that hearing required 100 witnesses. But I'm just saying that that is the problem. It's not just about the context that they focused on. They focused on the use of the private investigator is the thing that corrupts the system, that that private investigator can then provide evidence about the verdict or the juror's deliberations, and that is the concern. And that same thing could have happened here. Now, that juror sitting in this courtroom, Ms. McGregor, not in this courtroom but the one below, she is looking these defense attorneys in the eye every day, and yet she knows she's being investigated, or they're looking her in the eye. So the point is that that private investigator could say something that would change the testimony she gave in court about the incident, and she's concerned with that. She cannot be an effective juror. No one could be an effective juror under those circumstances. The mere fact it was only one is just an example of targeting, which is even worse in Sinclair, where at least they did it to everybody. I mean, here it was one juror targeted, and she knew that private investigators could be giving affidavits about things. So that's the concern. That's what destroys the system. If we can all hire private investigators as attorneys during the trial for the jurors, whatever jurors we want, especially the ones that we couldn't get excluded, then this system is destroyed. And if that's allowed by this court, then what I'm saying to you is that would become the regular practice. It's not just Internet presence. It's the use of the private investigator. Very distinct, because what you put on the Internet you know is out there publicly. What you don't put on it is your private life. That's intimidating to be looked at, and that part of Sinclair has not changed. So let me go back to this point about the evidence that you're asking. Well, I want you to explain to me very clearly in terms I can readily understand the distinction between the each and every exposure theory and the cumulative exposure theory, because I don't understand the distinction, to be honest. If each and every exposure is a substantial contributor to the cause of the disease, how is that different from saying that each and every exposure adds up to a cumulative effect that causes the disease? There's two questions that have to be answered for causation purposes, and I'm addressing your question. The first question is, did Mr. Crick have lung cancer, which was caused, at least in part, by asbestos? And that's the first question. The second question is, which exposures were a substantial cause of that disease? And the two different questions are, in essence, the distinction. The cumulative exposures are the cause of the disease. That's what you attribute the disease to. Whether a particular exposure within those cumulative exposures is considered a cause, meaning the defendants themselves, their activities, Owens, Illinois, or Mobil's exposures, is a separate question about substantial factor. So I don't quite understand what you're saying. I suppose if he worked for five different companies, including Owens, Illinois and Mobil, but including companies A, B, and C as well, maybe his doctor would think that asbestos exposure had contributed to the lung cancer, but it might not have been anything he was exposed to by Owens, Illinois or Mobil. But the problem is the evidence... I mean, I'll give you one example. This was with an exchange between Dr. Franks and one of Owens, Illinois's attorneys. The question is, if the hypothetical was one minute of exposure to asbestos, your answer would be yes. Answer, it would add to the cumulative exposure question, and it would be a substantial contributing factor to that person's ultimate disease. Answer, as I understand science, I would have to say yes. Well, take that exchange. I thought that was what Judge Lee said was not supposed to come in, and that Judge Shaw agreed with that, said this isn't the way we're going to do this. There needs to be some minimum level. We need to hear about how much the exposure added to the risk. We need data, basically, and it wasn't there. And so that is evidence that testimony did not go to the jury. I know, and I'm saying... That was definitely not included. And the point is if you go to... But what were you trying to get in that was better than that? We were trying to get in the testimony of Dr. Frank that the cumulative exposure was the cause. But what did cumulative mean to you? You're saying it didn't mean one minute of exposure. If you had had your way, what would the jury have heard? Well, the jury would have heard that it's my opinion that the cumulative exposure, based on his years, I think it was at least 12. Actually, in our brief, we said 12. I think our brief incorrectly omitted the Navy exposures. It was really about 6 more years in the Navy, so it would be really 18 years of exposures to asbestos. That cumulative exposure to asbestos was the cause of his lung cancer. Now, did you have your industrial hygienist... My light is on, Judge, but I'll continue. Well, I want you to answer this question. Was there evidence in the record that was a responsible estimate of how much asbestos he was exposed to over those years? Yes, there was. How much? Well, we didn't have a total for the years because all the experts testified, including the defense experts, that you couldn't calculate it for all his years. I mean, they said it was impossible. It's discussed in our brief, the defense experts. But this is done all the time. People will say it's so many pound equivalents or whatever, pounds per year, ounces, or whatever the measure is. But we know the duration of the exposure. But if there was almost no asbestos during all of those years, then you would still end up with so little that it might not be enough. We don't know. I'm saying, like, where? Thirty days. The testimony was a day will cause cancer of asbestos exposure. Thirty days will cause double the risk for lung cancer. Well, I'm as much at, you know, sevens and eights as Judge Wood is because even if you wanted to try to go for the each and every exposure theory, why wouldn't you hedge your bets and look more individually at Mr. Crick's exposure, you know, to asbestos attributable to Owens or Exxon or address the probability that his – I just have a – We laid all that out specifically in other hypotheticals on substantial factor causation that were also excluded. The Owens, Illinois exposure, I mean, we set forth in there the number of days, how many boxes of Kalo, and other factors were listed in the hypotheticals that were excluded on the specific defendants. And I should add that the testimony was clear that in a piece of asbestos the size of a sugar cube, about one centimeter, the number of fibers is two followed by 13 zeros. That's how many fibers there are. That's why you can't actually count the number of fibers because each breath alone is millions of fibers when you've got visible dust, which was also part of the testimony, the significance of visible dust, that that practically always exceeded contemporary standards. And in addition, Dr. Frank had the entire work history of Mr. Crick to review the depositions. He had the medical history. He had the hypotheticals presented to him. So finally, I would just add this, and I think I should sit down here. The Schultz case is very much similar to this, the Schultz case from this circuit. And in the Schultz case, the expert held the same opinion that every exposure to benzene was a contributing factor. That testimony was allowed for the same reasons Dr. Frank's testimony should be allowed, and that is that, as stated in the Ross case, which we sent you as supplemental authority, that it's the circumstances of the knowledge of Dr. Frank, his experience, and his application of that to the specific data about Mr. Crick's exposures to Owens, Illinois, to Mobil, and generally to asbestos that allows the admission of the testimony, simply because the expert in Schultz held the inadmissible. Okay. I think we have your point. You're going to run out of your time. Right. Inadmissible testimony that did not prevent the court from saying it's admissible. All right. Thank you. Mr. Riley? Thank you, Your Honor. Please, the Court. Mr. Riley, I really do have a question that I have got to get off my chest. Why would Exxon have risked what it did by sending out an investigator without first discussing it with the court and opposing counsel? Your Honor, as I represent Owens, Illinois, and counsel for Exxon is going to address that issue. I will defer to him if that's all right. I hope he'll answer that. I'm sure he will. Judge Rolner, your question, Judge Wood, your question about whether there's any difference between the every exposure and the cumulative exposure opinion is answered by Dr. Frank himself in his one-and-a-quarter-page report, in this case, that appears at pages 56 and 57 of the record. Here's what he says. The cumulative exposures Mr. Crick had to asbestos from any and all products containing any and all fibers would have contributed to developing his lung cancer. See, that's where I'm trying to dig down here, because I can imagine in my mind somebody saying, cumulative exposure matters, and this person was working in an environment where so many parts per million of fibers were in the ambient air all the time and working there for three years. You can imagine. So I'm sort of envisioning what I think the scientific testimony ought to look like. And you could say, cumulatively, after you've been exposed to all of that, your risk of developing mesothelioma or lung cancer or whatever is 100 times that of the normal population. And I'm just making up numbers here, but I want to know, is something like that in this record? It's not in the record because the plants didn't put it in the record. The report and the testimony makes no effort whatsoever to quantify the dose. Was there an industrial hygienist who testified, or was that on behalf of the defendants? There was an industrial hygienist on both sides. And the important thing here is, Dr. Frank didn't rely on any of the testimony of the plaintiff's industrial hygienist. And there's a reason why he doesn't rely on it. Because his methodology, the underlying methodology, if I may call it that, declares that information irrelevant. So this is the one fiber idea. And that methodology is applied by Dr. Frank, both to the question of, is this an asbestos-related lung cancer? And then, is this attributable to the exposures of a specific defendant? Well, what is the plaintiff's distinction that he makes in that footnote 13 of his brief, that the cumulative exposure is a methodology for attribution, while the each and every exposure testimony is a conclusion that all individual exposures are substantial contributing causes? With all due respect, it's scientific nonsense and it's legal nonsense, Your Honor. We defended this case on the basis that there is an established path in the science to determine whether or not a lung cancer can be fairly attributable to asbestos exposure. I feel that that must be true after all of these years of asbestos litigation. Of course it's true. And it requires evidence of underlying asbestosis, problem for the plaintiff, because even Dr. Frank admits there was no underlying asbestosis in this case. But didn't he have some damage to his lungs that hadn't yet become an asbestos-related disease? There was a dispute over whether or not he had a benign pleural plaque that was or was not caused by asbestos, but the methodology science embraces says that's not going to qualify it as an asbestos-related lung cancer. Even the so-called Helsinki article that Mr. McCoy advanced but his witness, Dr. Frank, rejected, refers to, again, good science in the published literature that is peer-reviewed, that says a cumulative dose of 25 fiber per cc years is necessary in order to double the risk of an asbestos-related lung cancer. That was also rejected by the methodology of Dr. Frank. There was no evidence in this record that either the cumulative exposure of Mr. Crick was anything like 25 fibers per cc years, nor was there any testimony giving any meaningful quantification to whatever it was that they wanted to attribute either to ExxonMobil or to Owens, Illinois. I understand Mr. McCoy to be saying that everybody said, well, this is just data that you can't collect, this number of fibers per cc years. The Schultz opinion itself, as Your Honor would know, refers to the methodologies whereby scientifically reliable causation estimates are made all the time. It's folly to suggest that science has no way of trying to reconstruct, in a reasonable fashion, what either the cumulative exposure is or any exposures attributable based on the facts of the case. The problem with Dr. Frank is the entire methodology is divorced from the facts of the case. I understand his causation theory to be sort of the factual equivalent of what's known as risk contribution theory as a legal matter in environmental toxic tort cases like the lead paint cases where the court says as a matter of law the burden is on the defendants to exculpate themselves, all lead paint manufacturers here, whatever asbestos manufacturers are involved, because the nature of the risk is such that we recognize that, or the court recognizes as a matter of law that everybody is responsible on an industry-wide basis. That's never been adopted in the asbestos context. Absolutely not. And it's only been very narrowly adopted by some states in lead paint cases. And it's been considered and rejected in the tort context. Right. So, I mean, it seems to me that that's the underlying theory of the expert causation methodology here, is that because asbestos is so risky, any exposure whatsoever is dangerous and therefore would shift the burden to the defendants to exculpate themselves. And that is not the legal standard applied under maritime law. That is not the legal standard applied to causation under Illinois law. Now, his link to Owens was this KALO stuff that he was working with. Is that right? That's the allegation, yes. Yeah, well, okay. I'll take that. That didn't seem to me to be something, at least that that was the link. I mean, there was no other link alleged, right, that he'd been working with this for Owens, right? For Owens, Illinois, that's right. Right. There was an allegation he had an aggregate exposure over many years. It's just no one bothered to quantify it and then use that as a basis for a causation opinion, which is what this Court's decisions very consistently require. So is cumulative exposure theory that Dr. Frank advanced absolutely no different from the each and every exposure theory that was proffered at the Dalbert stage, or is it that they are very close? I don't think Dr. Frank made any distinction between the two, as his report and his testimony makes clear. And whether they're close or identical, the question the Court has said is paramount is, what's the underlying methodology that would support an opinion with respect to either? Is it sufficiently linked to the facts of the case, and are those facts reliably analyzed under the scientific method? This opinion. Right. So as I was reading this, again, I got frustrated with the use of words, because I can imagine something that you might call a cumulative exposure theory, where you would say once the exposure reaches a certain point, that's enough to create a medically ascertainable effect for the average person. That we're going to call a substantial contributing factor. But I guess that's what's missing. It's what's missing. Indeed, that's what Dr. Frank turned his back on. But there's nothing wrong with calling that cumulative. I mean, that's cumulative just as much as one fiber at a time is cumulative. You could eliminate the word cumulative and say, is this a lung cancer you can scientifically attribute to the aggregate asbestos exposure? Again, the methodological flaw of Dr. Frank is, I don't care how much he was exposed. I don't need a quantification of that, even qualitatively. Any exposure of a person with lung cancer is sufficient for me to say it's linked to asbestos, and any exposure to a product that contained asbestos is enough for me to say that defendant did it. Weren't they getting close to that, though, in their proffers during the trial, when they're talking about how many boxes he handled? They sounded like they were getting down to some more specifics. Dr. Frank declared all of that irrelevant. He never considered it. His methodology has to support his opinion, and he doesn't want to acknowledge, as he writes, as the record shows, 25 to 30 of these kinds of reports, just like this one, in a day in this litigation. He doesn't want to be bothered with the facts of an individual case. He doesn't want to have to worry about quantification. That's the problem here. This is why this case is so important. This problem shows up over and over and over again in the asbestos litigation, as well as other toxic tort litigations, and that's why the courts are drawing the line and saying, enough, this is not science. Thank you very much. Thank you very much. All right. So I think, Mr. Boehm, you have your first question already asked for you. I do. Thank you, Your Honor. May it please the court, counsel, my name is Garrett Boehm. I'm here on behalf of ExxonMobil Oil Corporation. Judge Rovner, the reason why there wasn't a discussion with the judge after Judge McIntyre and McGregor came forward with the information about the birthday party and Mr. McGregor. That's not what I asked. But, of course, I didn't ask it of you. But what I asked was why would Exxon have risked what it did by sending out an investigator without first discussing it with the court and opposing counsel? You know, with the investigation, it's not such a big deal, as you've alleged in the briefs. Why not just run it past the court first? Because there wasn't the feeling that there was a need to do that. It was such a benign action. But the judge didn't respond that way. The judge was clearly troubled in his remarks. He says, maybe I should take this to our rules committee. This was not standard. He didn't make that comment, and he didn't know about it. So he was troubled. And it wasn't a standard case. It wasn't a standard scenario, certainly. But what was going on here was a brief, very focused discussion with a non-juror, a non-party, a non-witness, someone who didn't really have any relationship to the case, as Judge Shaw recognized. And he was going to be asked about two questions. Do you remember your birthday party? Do you remember if Ms. McGregor and Mr. Crick were at that birthday party? The answer to those questions were, yes, I remember the birthday party, but no, I can't recollect if Mr. Crick was there or not. So ex post, it turns out to be not too much of a big deal because that's the answer that he gives. But ex ante, as you are out there, your investigator, your representative is out there, if the man had said, I keep forgetting his name, Sanson or something? Skaman. Skaman. If Mr. Skaman had said, oh, yes, you know, Mrs. McGregor and Mr. Crick were both at the party, you can't tell me there wouldn't have been follow-up. It would have ballooned into something much more. Certainly that would have needed to be brought to the court's attention immediately, no doubt. I am very troubled by this, very troubled. And I want to know why you think that this investigation was at all like a juror's social media profile. An investigator goes in person to her friend's house. That's unnerving in itself. She was sure to hear about it. I cannot imagine that the friend would not contact her to tell her, look, a strange person appeared at my house and they're asking questions about her. All the things that courts say about intimidating juror investigations are certainly true here. It's unnerving. It's intrusive. It makes a jury, juror worry about what will be uncovered. How is this even remotely like looking at someone's public Facebook page? I don't get it. Well, I think that looking at social media is actually much more intrusive in this day and age. Not if it's the public page, if you're hacking into their private material maybe, but people put anything and everything on their public spaces. Yes, they do. It seems like there's no limit to what people will put on things like Facebook and Instagram. It's surprising what you will find on social media sites. So in this case, the discussion with Mr. Skamen was certainly nowhere near as broad. It was very focused and limited. As it turned out. You didn't know. Certainly, but the instructions to that investigator were to be very limited, find out this basic information and report back to us, which is what happened. If the answer to those questions was yes, they're both here, then the determination was we need to bring this to the judge's attention because there may be real bias here that has to be concerned and maybe this juror needs to be removed. Obviously, that didn't turn out to be the case. She did bring the contact to Judge Shaw's attention. One thing that I should mention is the plaintiff seems to suggest that the standard of review for this court should be de novo, but that's simply wrong. This court on many occasions has indicated the standard of review is abuse of discretion and that Judge Shaw stood in a very unique position, had firsthand contact with Judge Jura McGregor and his determination is entitled to great weight. But there's a legal issue embedded in what he said. When he makes the determination that he can't take any action about this unless he can find prejudice, and of course there you run squarely into evidence rule 606B, which cuts off most of the inquiry that you'd actually want to make. You really can't find out if there was prejudice because that would intrude into the jury's deliberations. So by saying you have to find prejudice, he essentially says it's unredressable. I don't think that's the case. I think that in, for instance, the Olano case before the United States Supreme Court, that court indicated that the ultimate test was discerning whether or not there had been an effect upon the juror's deliberations and thereby the jury's verdict. And it's from the who, the what, and the when information that could be obtained consistent with rule 606 that the district court judge then makes that determination. Has the juror's deliberation been affected? And then thereby has the verdict been affected? But you have to do that. The last part should draw a line between what you think is a reasonable investigation of a friend and what happened in the Sinclair case. In other words, could the defense have an investigator follow a friend around for a while as long as he doesn't find out? Or does the finding out not matter? Could you trail a juror's family or children? Could you go through their recycling after it went to the recycling center, their garbage at the dump? What do you think are the lines here? Well, the lines are if there is any, if there is, the district court judge determines that there is a basis for concluding that the juror has been intimidated. If there is any evidence that is outside of the trial that is somehow fed to the juror that affects the juror's deliberation. If there isn't any instance of intimidation or any interference with the judicial mechanisms, as there was in Sinclair, Sinclair's a much different case. If there's not that intimidation and if there's not evidence that should not be considered by the juror, then that line hasn't been crossed. But, you know, it makes me think that when the judge summons the veneer, the judge ought to say to them, and ladies and gentlemen, if you're called upon to serve on a jury, please be aware that you may have people following you and you may have your, you know, Facebook pages reviewed and you may have investigators. So, you know, mind your P's and Q's, you know, while you're serving on a jury. It raises the price, basically, of jury service. I would suggest that any surveillance like that that occurred in Sinclair or any surveillance of the juror himself or the juror's family members would be utterly inappropriate, and certainly that's not what occurred here. So if there is a line to be drawn, it's certainly that there should not be any overt, unannounced, undisclosed surveillance of a juror or a juror's family. I think that would be fair, but that's not this case at all. If it wasn't such a big deal. I'm sorry, Judge. Judge, I couldn't hear the first part of your question. You were chopping up a little. Oh, dear. Well, let's see. I mean, I can't imagine it not making a juror worry about what kind of information the lawyers might dig up. And you see, if it wasn't such a big deal, why wouldn't you have consulted with the court and opposing counsel first and say, we want to look further into this question, may we? I find it so chilling, Mr. Bone. I really, really am worried about this. Well, I don't think there was any chilling of the juror deliberations. I mean, certainly, Judge Drew McGregor recognized that maybe her recollection after being empaneled of this birthday party, that it was a little hazy, was important and should bring it to the court's attention. So she knew that information was out there. And I don't think it should be a surprise that maybe there was a follow-up question to Mr. Stamen to see if he knew. And this isn't the sort of situation of there was some suggestion to Mr. Stamen of, well, maybe you should be ruling in this way or that way. That kind of really overt attempt to affect the jury's deliberations isn't present here. There are subtle threats in this world that people feel. There are subtle threats, certainly, Your Honor. And I think that Judge Shaw was able, in his conversation with Juror McGregor, to determine whether or not she felt threatened, felt intimidated, and that her deliberations were affected. And I think he concluded the answer to that question is no. And his determination is entitled to deference. I don't think that was an abuse of discretion. And I would ask this Court to affirm the judgment below. All right. Thank you very much, Mr. Boehm. I think you have about a minute left. Is that what he has? Yeah, you have a minute left, Mr. McCoy. Thanks for the minute. Okay, so it's not proper to draw the lines after the fact for private investigator surveillance. That can't be done. We can't have hearings after every jury verdict about what happened, nor can jurors be concerned with the risk that these investigators are going to give false affidavits like happened in Sinclair. And, again, had Mr. Crick won, who knows what the answer would have been from the investigator about what Mr. Schaman actually said. It might have been well different, as it was in Sinclair, to cause a mistrial. Now, I would also add that Dr. Frank's testimony, as we say at page 5 of our reply brief, was based on his personal qualifications, hypothetical facts in evidence at trial that were not objected to, Crick's deposition testimony, his medical records, his smoking history, synergistic effects of tobacco smokes and asbestos fibers, personal experience studying workers exposed to asbestos beginning in 1968, the medical and scientific literature, the biological effects of asbestos, the latency period for asbestos disease. I say this because it wasn't just based on each and every exposure, and he didn't even talk about that. It was based on how long it was. And I would add that the quantification requirement was rejected in several Illinois cases that we put into our brief. It was rejected in the recent Ross decision that we provided a supplemental authority. It's not part of the asbestos world. All right. And finally, Judge, I would say that the defense experts at page 8 of our reply brief said that the reconstruction, it's impossible. So it's based on his testimony, and in Schultz, the expert excluded in Schultz was not the one who quantified the exposures. That was somebody else, the expert in Schultz. Okay, thank you very much. Thank you, Judge. We will take the case under advisement. Thanks to all counsel.